UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SHECK MULBAH,<br><br>                    Plaintiff,<br><br>        vs.<br><br>CODY JANSEN, in his individual<br>capacity,<br><br>                    Defendant. | 4:20-CV-04127-KES<br><br><br>ORDER DENYING IN PART AND<br>GRANTING IN PART DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT<br>AND DENYING PLAINTIFF'S MOTION<br>FOR PARTIAL SUMMARY JUDGMENT |

Plaintiff, Sheck Mulbah, brought suit against defendant, Cody Jansen, alleging various violations of his civil rights under 42 U.S.C. § 1983. Docket 1. Specifically, Mulbah alleges, under the Fourth and Fourteenth Amendments, that Jansen (1) unlawfully seized him by stopping his rental vehicle, (2) unlawfully prolonged the traffic stop, and (3) unlawfully searched Mulbah's rental vehicle. *Id.* at 8-11. Jansen moves under Federal Rule of Civil Procedure 56 for summary judgment on each of Mulbah's claims on the merits and based on qualified immunity. Docket 13. Mulbah opposes the motion. Docket 22. Mulbah moves for partial summary judgment on Count II of the complaint—the unlawful prolongation count. Docket 18. Jansen opposes the motion. Docket 25. For the following reasons, the court denies in part and grants in part Jansen's motion for summary judgment, and the court denies Mulbah's motion for partial summary judgment.

**BACKGROUND**

The facts, viewed in the light most favorable to the non-moving party, are as follows:[1]

## I.   Facts Relevant to Count I

Mulbah is a resident of New York City, New York. Docket 23 ¶ 1. Mulbah had recently graduated from Stanford University at the time of the facts underlying this lawsuit. *Id.* Jansen is employed by the State of South Dakota as a Trooper with the South Dakota Highway Patrol. *Id.* ¶ 2.

On June 19, 2020, Mulbah and two friends travelled through South Dakota on Interstate 90 in a rental van. *Id.* ¶ 3; Docket 20 ¶ 1; Docket 29 ¶ 1. Mulbah's friends also attended Stanford University. Docket 23 ¶ 3; Docket 20 ¶ 2; Docket 29 ¶ 2. Mulbah and his passengers are Black men, and, at the time of the facts underlying this lawsuit, were in their early twenties. Docket 20 ¶ 3; Docket 29 ¶ 3. Jansen is white. Docket 20 ¶ 3; Docket 29 ¶ 3. The three were on a road trip from San Francisco, California to Chicago, Illinois. Docket 23 ¶ 3.

On the night of June 19, 2020, Jansen sat in his patrol vehicle in the crossover west of the interchange between Intestate 29 and Interstate 90 outside of Sioux Falls, South Dakota. *Id.* ¶ 4. At approximately 10:40 p.m., Jansen observed a white van driven by Mulbah near Sioux Falls. *Id.* Jansen

---

[1] The facts regarding Counts I and III are viewed in the light most favorable to Mulbah as the non-moving party. On Count II, both parties moved for summary judgment, so the court views the facts in favor of the non-moving party on each motion and identifies any areas of dispute.

alleges the van appeared to be speeding. *Id.* Jansen claims that, according to his radar, Mulbah's vehicle was travelling 65 miles per hour in a construction zone where the speed limit was 55 miles per hour. *Id.* Mulbah disputes that his vehicle exceeded the speed limit. *Id.* Under South Dakota Highway Patrol policy, an officer is required to stop and issue a citation to a driver who travels five miles per hour above the posted speed limit unless the officer believes that issuing a warning is warranted. *Id.* ¶ 5.

Jansen pursued Mulbah's vehicle, eventually initiating his emergency lights. *Id.* ¶ 7. Mulbah stopped his vehicle on Interstate 90 near the Cliff Avenue exit outside of Sioux Falls. *Id.* According to Jansen, when he decided to stop Mulbah's vehicle, he knew that: (1) it was speeding, (2) it had California plates, and (3) it was rented. *Id.* ¶ 6. Jansen did not know the race of Mulbah or his passengers, or how many people were in the vehicle. *Id.* Again, Mulbah disputes that he was speeding. *Id.* The cameras in Jansen's vehicle recorded the traffic stop. *Id.* ¶ 8. One camera captured the events outside of Jansen's vehicle and one captured the events inside Jansen's vehicle. *Id.*

Jansen exited his vehicle and approached Mulbah's van on the passenger side. *Id.* ¶ 9. Jansen asked for Mulbah's driver's license and registration or rental papers for the van. *Id.* ¶ 26. Jansen told Mulbah that he was travelling 65 miles per hour in a 55 miles per hour zone. *Id.* ¶ 10. Jansen contends that Mulbah did not deny that he was speeding, and that Mulbah said he thought the speed limit was 65 miles per hour. *Id.* ¶ 11. Jansen told Mulbah that he was just going to issue him a warning. *Id.*; Docket 20 ¶ 4;

3

Docket 29 ¶ 4. Mulbah denies that he ever admitted to exceeding the speed limit during this conversation with Jansen. Docket 23 ¶ 11. Mulbah testified that he relied on the Google Maps application during his trip, which told him that the speed limit where he was stopped by Jansen was 55 miles per hour. *Id.* ¶ 14, Additional Disputed Material Facts ¶ 1. The night Mulbah was stopped, he posted twice on Instagram that he was traveling 65 miles per hour. *Id.* ¶ 12. Mulbah again disputes that he exceeded the speed limit or that he ever admitted to exceeding the speed limit. *Id.* Instead, he attributes any reference to driving 65 miles per hour on Instagram to a typographical error that was the product of Mulbah's extreme emotional distress in the wake of the traffic stop. *Id.*

Jansen contends that Mulbah has no evidence that Jansen's radar gun was not working correctly. *Id.* ¶ 15. Jansen tests the radar each day, and he did so both before and after his shift on June 19, 2020. *Id.* Mulbah alleges that the evidence in support of his claim that he was not speeding includes Mulbah's personal recollection while driving, his reliance on speed limit signs posted on the road, and his use of the Google Maps application to monitor the applicable speed limit. *Id.*

## II.    **Facts Relevant to Counts II and III**

After Jansen and Mulbah's initial conversation, Jansen informed Mulbah through the passenger window that he was going to issue him a warning ticket. *Id.* ¶ 16; Docket 20 ¶ 4; Docket 29 ¶ 4. Jansen asked Mulbah if he would sit in Jansen's patrol vehicle while Jansen completed the warning ticket. Docket 23 ¶

16; Docket 20 ¶ 4; Docket 29 ¶ 4. Mulbah agreed to accompany Jansen to the patrol vehicle. Docket 23 ¶ 17. According to Jansen, it is standard procedure for South Dakota Highway Patrol troopers to ask a driver who is being ticketed or warned to accompany the trooper to his or her patrol vehicle. *Id.* ¶ 18.

Jansen had his police canine, Rex, in the backseat of the vehicle. *Id.* ¶ 19. Jansen and Rex completed canine training together, and Rex completed certification without any problems or issues. *Id.* ¶ 54. Rex was behind a screen between the front and back seats of the vehicle. *Id.* ¶ 19. The screen prevented Rex from reaching the front seat or anyone in the front seat. *Id.* ¶ 20. Jansen warned Mulbah that Rex was in the vehicle and that Rex would bark at Mulbah. *Id.* ¶ 21; Docket 20 ¶ 5; Docket 29 ¶ 5. Jansen said he did not want Mulbah to be scared by Rex. Docket 23 ¶ 21. When Jansen and Mulbah neared Jansen's patrol vehicle, Rex began barking loudly. Docket 20 ¶ 5; Docket 29 ¶ 5. Mulbah initially hesitated to enter Jansen's patrol vehicle because of Rex's barking; Jansen told Mulbah that Rex could not hurt him or get to him in any way. Docket 23 ¶ 22; Docket 20 ¶ 6; Docket 29 ¶ 6.

Jansen inspected Mulbah's driver's license while Mulbah attempted to seat himself in the vehicle. Docket 23 ¶ 22. Mulbah contends that the passenger seat in Jansen's patrol vehicle had less space than a seat in an ordinary vehicle. Docket 20 ¶ 7. Jansen disputes this. Docket 29 ¶ 7. Jansen does not dispute Mulbah's contention that Jansen's laptop intruded over the passenger seat's space and that the passenger seat was moved forward towards the dashboard more than the driver's seat was forward. Docket 20 ¶ 7; Docket

29 ¶ 7. Rex continually barked while Mulbah situated himself in the passenger seat. Docket 20 ¶ 8; Docket 29 ¶ 8. Jansen did not order Rex to be silent until almost a full minute of barking elapsed. Docket 20 ¶ 8; Docket 29 ¶ 8. The cramped passenger seat and Rex's continual barking made it difficult for Mulbah to situate himself in the vehicle. Docket 20 ¶ 9; Docket 29 ¶ 9. It took Mulbah two attempts to close the door to the vehicle. Docket 20 ¶ 9; Docket 29 ¶ 9.

Rex barked several times while Mulbah was in the vehicle. Docket 23 ¶ 23. Jansen attempted to silence Rex using a command several times. *Id.* Mulbah did not tell Jansen that he was afraid of Rex or that he wanted to exit the vehicle. *Id.* ¶ 24. Jansen contends that Mulbah is not afraid of dogs generally, but Mulbah disputes that he was not intimidated by Rex during the traffic stop. *Id.* ¶ 25. Jansen states that he did not threaten or indicate that he might deploy Rex during the traffic stop and that Mulbah has no evidence Jansen used Rex to intimidate Mulbah. *Id.* ¶ 56. Mulbah counters that he was intimidated by Rex. *Id.*

To produce the warning ticket for Mulbah, Jansen had to manually enter Mulbah's driver's license and vehicle information into his laptop. *Id.* ¶ 27. During this process, Jansen received the results of Mulbah's vehicle registration query, which showed that there were no issues with the vehicle's registration. Docket 20 ¶ 17; Docket 29 ¶ 17. Later, Jansen received the results of Mulbah's driver's license query, which showed that Mulbah had no warrants and was a valid driver. Docket 20 ¶ 20; Docket 29 ¶ 20.

Jansen engaged Mulbah in conversation throughout the stop. Docket 23 ¶ 28. Jansen's intention was to make Mulbah more comfortable, but Mulbah was not comforted. *Id.* Jansen asked Mulbah where he and his passengers were coming from and where they were going. *Id.* ¶ 29; Docket 20 ¶ 10; Docket 29 ¶ 10. Mulbah replied that they recently graduated from Stanford and were making the trip from San Francisco to Chicago. Docket 23 ¶ 29. Mulbah also stated that he would then continue home to New York City from Chicago. Docket 20 ¶ 10; Docket 29 ¶ 10. Mulbah and Jansen dispute whether Mulbah made eye contact with Jansen while answering this question. Docket 20 ¶ 10; Docket 29 ¶ 10. Jansen also asked if they were making any stops along the way. Docket 23 ¶ 30; Docket 20 ¶ 22. Mulbah stated that they stopped at Mount Rushmore. Docket 23 ¶ 30. Jansen contends that Mulbah did not say that he and his passengers made any other stops; Mulbah disputes Jansen's characterization of his answer, noting that he merely answered Jansen's question about stops during the trip by listing one of them. *Id.*; *see also* Docket 20 ¶ 22; Docket 29 ¶ 22. Jansen asked Mulbah about New York City, what degree he got from Stanford, and whether he had a job after graduation. Docket 23 ¶ 31; Docket 20 ¶ 18; Docket 29 ¶ 18. Jansen and Mulbah dispute whether Mulbah looked at Jansen while answering these questions. Docket 20 ¶¶ 13, 19; Docket 29 ¶¶ 13, 19.

Jansen then stared at his laptop, scrolled, and typed on his laptop in silence for approximately 40 seconds. Docket 20 ¶ 23; Docket 29 ¶ 23. While continuing to type and scroll on his laptop, Jansen confirmed Mulbah's full

name and address in New York City, and Jansen asked Mulbah about the Bronx. Docket 20 ¶ 24; Docket 29 ¶ 24. Mulbah and Jansen disagree as to whether Mulbah made eye contact. Docket 20 ¶ 24; Docket 29 ¶ 24. For the next 50 seconds, Jansen typed and scrolled in silence. Docket 20 ¶ 25; Docket 29 ¶ 25. Jansen then probed why Mulbah and his passengers were driving rather than flying to Chicago. Docket 23 ¶ 32; Docket 20 ¶ 26; Docket 29 ¶ 26. Mulbah responded that he and his passengers were first-generation, low-income students who wanted to take a road trip rather than flying somewhere for spring break. Docket 23 ¶ 32; Docket 20 ¶ 26; Docket 29 ¶ 26. As Mulbah answered this question, Rex resumed barking, which caused Mulbah to jolt forward and look back at the canine. Docket 20 ¶ 27; Docket 29 ¶ 27. For the next 90 seconds, Jansen typed and scrolled on his laptop, and he looked around the vehicle and at Mulbah. Docket 20 ¶ 28; Docket 29 ¶ 28. Jansen then asked Mulbah for his cell phone number, returned Mulbah's license, and began printing the warning ticket. Docket 20 ¶ 28; Docket 29 ¶ 28.

Jansen thought Mulbah was more nervous than most people are when sitting in Jansen's patrol vehicle. Docket 23 ¶ 33. Jansen contends that he noticed Mulbah's elevated heart rate and quick breathing, and that Mulbah was not relaxed. *Id.* ¶¶ 33-34. Mulbah disputes Jansen's characterization and notes that any perceived nervousness can be explained by Rex's barking and the stop's racial context. *Id.* Mulbah was uncomfortable throughout the stop, and he thought he communicated his discomfort to Jansen nonverbally. *Id.* ¶ 35.

8

Before the warning ticket finished printing, Jansen asked Mulbah if he or his passengers were carrying any weapons, marijuana, other drugs or paraphernalia, or THC waxes or oils. *Id.* ¶ 36; Docket 20 ¶¶ 30-32; Docket 29 ¶¶ 30-32. Mulbah responded that they were not. Docket 23 ¶ 36; Docket 20 ¶ 31; Docket 29 ¶ 31. The parties dispute whether Mulbah made eye contact with Jansen while answering these questions. Docket 20 ¶ 33; Docket 29 ¶ 33. Jansen claims that, based on his training and experience, he was suspicious of Mulbah. Docket 23 ¶ 37. Jansen based his suspicion on various factors: the trip's route from California to Chicago and later, New York; the rented vehicle being a van, which Jansen alleges are frequently used by drug couriers; the trip's route was less direct than it could have been; Mulbah and his passengers only made one stop; the trip was one-way; and Mulbah's perceived nervousness. *Id.* ¶ 37. Mulbah disputes each of Jansen's perceived factors. *Id.* Regarding Jansen's perception of Mulbah's nervousness, Jansen highlights that Mulbah leaned forward in his seat and did not make eye contact with Jansen. *Id.* Mulbah disputes that he did not make eye contact with Jansen. Docket 23 ¶ 37; *see also* Docket 20 ¶¶ 10, 13-14, 16, 19, 24, 33. Jansen contends that Mulbah had room to lean back in the passenger seat of the patrol vehicle. Docket 23 ¶ 38. Mulbah argues he did not have room to lean back because the barking canine was an impediment. *Id.*

While folding the printed warning ticket, Jansen asked Mulbah for permission to search his rental vehicle. *Id.* ¶ 41; Docket 20 ¶ 34; Docket 29 ¶ 34. Jansen asserts that Mulbah consented without any apparent hesitation,

9

while Mulbah contends that he did not feel as though he could withhold his consent. Docket 23 ¶ 41, at 14 ¶ 3. Jansen handed Mulbah the warning ticket after receiving his consent to search the vehicle. Docket 20 ¶ 34; Docket 29 ¶ 34. Jansen then told Mulbah that he would ask Mulbah's passengers for their permission to search the vehicle as well. Docket 23 ¶ 42. Jansen initially told Mulbah that Mulbah could wait in his patrol vehicle while Jansen asked the passengers for their permission, but he then told Mulbah it would be better if he stood outside of the patrol vehicle so that Mulbah did not have to listen to Rex's barking. *Id.* ¶ 43. Mulbah's passengers gave Jansen consent to search the rental vehicle. *Id.* ¶ 45. Altogether, Mulbah was in the vehicle for approximately 10 minutes. *Id.* ¶ 44.

Mulbah's passengers assisted Jansen in searching the rental vehicle by removing and opening luggage and containers. *Id.* ¶ 46. During the search, Jansen, Mulbah, and Mulbah's passengers conversed, and Mulbah and his passengers laughed and told jokes. *Id.* ¶ 47. Mulbah alleges that he and his friends joked and laughed during the search to cope with trauma. *Id.* Mulbah asserts that the trauma he experienced from the traffic stop and search later caused him to cry and have nightmares. *Id.* at 14 ¶ 5.

Jansen's search for distribution-sized quantities of drugs was fruitless. *Id.* ¶ 48. Jansen did not find any contraband in the rental vehicle. *Id.* Jansen asserts that the search lasted approximately five minutes. *Id.* ¶ 49. Mulbah disputes this and contends that the search lasted approximately 7 minutes and 13 seconds. *Id.* After completing his search, Jansen thanked Mulbah and his

passenger, shook their hands, and wished them a good trip. *Id.* ¶ 50. The entire traffic stop lasted less than 20 minutes. *Id.* ¶ 51.

On June 30, 2020, counsel for Mulbah sent Colonel Rick Miller of the South Dakota Highway Patrol a complaint under SDCL §§ 3-21-2 and 3-21-3. *Id.* ¶ 52. South Dakota Highway Patrol Lieutenant Christopher Koltz reviewed the complaint and video of the stop. *Id.* ¶ 53. Koltz issued a report on July 7, 2020, concluding that Jansen acted consistent with South Dakota Highway Patrol policy and procedure. *Id.* Mulbah then initiated this lawsuit. *See* Docket 1.

## DISCUSSION

### I.   Legal Standards

#### A.   Summary Judgment Standard

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party can meet its burden by presenting evidence that there is no dispute of material fact or that the nonmoving party has not presented evidence to support an element of its case on which it bears the ultimate burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party must inform the court of the basis for its motion and also identify the portions of the record that show there is no genuine issue in dispute. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted).

11

To avoid summary judgment, "[t]he nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005) (quoting *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995)). Summary judgment is precluded if there is a genuine dispute of fact that could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). When considering a summary judgment motion, the court views the facts and the inferences drawn from such facts "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

**B.    Qualified Immunity Standard**

"Qualified immunity is an immunity from suit, not a mere defense to liability." *De La Rosa v. White*, 852 F.3d 740, 743 (8th Cir. 2017). The qualified immunity doctrine "balances 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Duffie v. City of Lincoln*, 834 F.3d 877, 881 (8th Cir. 2016) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The doctrine "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *New v. Denver*, 787 F.3d 895, 899 (8th Cir. 2015) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)).

"Qualified immunity protects law enforcement officers from liability for civil damages so long as their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known." *Garcia v. City of New Hope*, 984 F.3d 655, 663 (8th Cir. 2021) (quoting *Perry v. Woodruff Cnty. Sheriff Dep't*, 858 F.3d 1141, 1144 (8th Cir. 2017)). Under this standard, qualified immunity protects officers "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation." *Id.* (alteration in original) (quoting *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019)); *see also Duffie*, 834 F.3d at 882. For a right to be clearly established, its contours "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A clearly established right does not require "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *De La Rosa*, 852 F.3d at 745 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The court has discretion as to which step of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236.

"When there is no dispute among the parties to the relevant facts . . . a court should always be able to determine as a matter of law whether or not an officer is eligible for qualified immunity." *New*, 787 F.3d at 899 (quoting *Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000)).

## II.     Count I: The Initial Stop

Jansen argues that he is entitled to qualified immunity, and thus, summary judgment, on Count I because he reasonably believed that he had a lawful basis to stop Mulbah's rental vehicle. Docket 16 at 6-9. Conversely, Mulbah contends that Jansen did not have a lawful basis in fact to stop Mulbah's rental vehicle, and a genuine dispute of material fact exists as to whether Jansen reasonably believed that he had a lawful basis to stop Mulbah's rental vehicle. Docket 22 at 6-9. The court first addresses whether the right allegedly violated was clearly established at the time of Jansen's traffic stop of Mulbah. *See Pearson*, 555 U.S. at 236.

### A.     Whether Mulbah's Right Was Clearly Established

The Fourth Amendment protects against unreasonable searches and seizures by the government. U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008). When law enforcement has probable cause to believe that a traffic violation has occurred, a warrantless traffic stop is constitutionally permissible. *De La Rosa*, 852 F.3d at 743 (quoting *Whren v. United States*, 517 U.S. 806, 809-10 (1996)). Even a minor traffic violation gives an officer probable cause stop a vehicle. *Garcia*, 984 F.3d at 664. "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the officer at the time." *Id.* (quoting *United States v. Demilia*, 771 F.3d 1051, 1054 (8th Cir. 2014)). An officer may also initiate an investigatory traffic stop where the officer has reasonable suspicion that

14

criminal activity is afoot. *Duffie*, 834 F.3d at 883 (quoting *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2019)). Because Jansen contends that he had probable cause to believe that Mulbah was speeding, the court addresses probable cause—not reasonable suspicion—in the context of qualified immunity. *See* Docket 16 at 7.

Here, the court concludes, and Jansen does not contend otherwise, that the Mulbah's right to be free from an unreasonable seizure in the context of a traffic stop is clearly established. At the time of the traffic stop, the law clearly required, and continues to require, an officer making a traffic stop to have either reasonable suspicion that criminal activity is afoot or probable cause that a traffic violation or other law has been violated. The court turns next to whether Jansen violated that right.

**B.     Whether Jansen Violated Mulbah's Clearly Established Right**

      **1.     Probable cause in fact**

As a threshold matter, the court must determine whether probable cause in fact existed for Jansen to stop Mulbah's rental vehicle. If Jansen had probable cause in fact to stop Mulbah's rental vehicle, he is entitled to summary judgment on the merits and qualified immunity because he has not violated a clearly established right. If not, the court continues its qualified immunity analysis.

Jansen contends that he had probable cause in fact to stop Mulbah's rental vehicle because his radar gun indicated that Mulbah was speeding. Docket 16 at 8-9. Jansen notes that he has been using a radar gun for at least

11 years, he has never had a radar gun fail an accuracy test, and the radar gun that he used on Mulbah's vehicle passed accuracy tests before and after the stop. Docket 32 at 4; Docket 17-2 at 8. Mulbah counters that he was not speeding. Docket 22 at 6-7. Mulbah relies on various factors from his deposition testimony in support of his claim: (1) he recalled driving slowly while other cars passed him; (2) he followed the posted speed limit signs; and (3) he used the Google Maps application to monitor his speed, making sure that his speed did not exceed the limit on the application. *Id.* at 7; *see also* Docket 23 ¶ 15; Docket 24-2 at 5-6, 10, 14-17, 23. Mulbah also argues that Jansen has no proof of his radar gun's reading showing that Mulbah was speeding except Jansen's personal recollection. Docket 22 at 7.

Here, there is no video evidence of Mulbah speeding or Jansen's use of the radar gun to establish probable cause. Instead, the court is left with the parties' competing versions of events. "Accordingly, [the court] conclude[s] that this is one of those usual qualified immunity cases in which viewing the facts in the light most favorable to the nonmovant means adopting the plaintiff's version of the facts." *Garcia*, 984 F.3d at 664 (quoting *Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018)). Thus, viewing the facts in the light most favorable to Mulbah, the court concludes that a jury could find that Mulbah was not in fact speeding.

### 2.    Objective reasonableness

Jansen next argues that, even if he did not have probable cause in fact to stop Mulbah's rental vehicle, he had an objectively reasonable basis to believe

16

that Mulbah was speeding. Docket 16 at 7-9; Docket 32 at 4-9. Jansen relies on the use of his radar gun to establish the objectively reasonable basis. Docket 16 at 7-9; Docket 32 at 4-9. Mulbah counters that factual disputes exist as to whether Jansen had an objectively reasonable basis to stop Mulbah's rental vehicle. Docket 22 at 7-9.

In a § 1983 action alleging a violation of the Fourth Amendment right to be free from an unreasonable seizure in the context of a traffic stop, "qualified immunity applies when 'a reasonable officer could have believed the [stop] to be lawful, in light of clearly established law and the information the [stopping] officer possessed.' " *New*, 787 F.3d at 899 (cleaned up) (quoting *Hunter*, 502 U.S. at 227). "[T]he issue for immunity purposes is not probable cause in fact but arguable probable cause, that is, whether the officer should have known that the [seizure] violated plaintiff's clearly established right." *Id.* (first alteration in original) (quoting *Habiger v. City of Fargo*, 80 F.3d 289, 295 (8th Cir. 1996)). "[Q]ualified immunity does not depend on whether [Mulbah] was *in fact* [speeding]; rather, the key is [Jansen's] *objectively reasonable beliefs* under the circumstances." *Garcia*, 984 F.3d at 664-65 (first alteration and emphases in original) (quoting *Boude v. City of Raymore*, 855 F.3d 930, 933 (8th Cir. 2017)). Under Eighth Circuit precedent, an officer does not violate the Fourth Amendment and is entitled to qualified immunity if he acts upon an objectively reasonable mistake of fact. *Id.* at 665.

Jansen argues that his reliance on his radar gun to measure Mulbah's speed gave him an objectively reasonable basis to stop Mulbah's rental vehicle.

17

Docket 16 at 7-9; Docket 32 at 4-9. Jansen again notes that he has been using a radar gun for at least 11 years, he has never had a radar gun fail an accuracy test, and the radar gun that he used on Mulbah's vehicle passed accuracy tests before and after the stop. Docket 32 at 4; Docket 17-2 at 8. He cites several criminal cases for the proposition that, where an officer is proficient in the use of a radar gun and regularly tests the radar gun's accuracy, the officer's observation of a traffic violation using his radar gun gives the officer an objectively reasonable basis to stop a vehicle. Docket 32 at 4-9. Jansen stresses that Mulbah does not dispute the fact that Jansen is an experienced user of a radar gun, his radar gun is accurate, and that his radar gun recorded Mulbah going 65 miles per hour in a 55 miles per hour zone. *Id.* at 4, 6. Conversely, Mulbah renews his arguments that he was not speeding. Docket 22 at 7. He supports this contention with the same reasons that were previously mentioned, arguing that these reasons create a genuine dispute of material fact as to whether Jansen had an objectively reasonable basis for stopping him.

Here, the court is again left with the parties' competing versions of events. There is no video evidence that captures Mulbah speeding, nor is there a recording of Jansen's use of his radar gun reflecting Mulbah's speed. Instead, the court has Jansen's word against Mulbah's. The court finds *Garcia* helpful to resolve this conflict. In *Garcia*, plaintiff's vehicle was stopped after he raised his middle finger to a law enforcement officer. 984 F.3d at 660. Garcia brought suit against the officer for violation of his civil rights under 42 U.S.C.

18

§ 1983, alleging that he was unreasonably seized in violation of the Fourth Amendment. *Id.* at 662. The officer who stopped plaintiff offered two justifications for stopping him: (1) disorderly conduct for raising his middle finger at her and (2) unlawfully covering his license plate in violation of state law. *Id.* Plaintiff disputed that his license plate was illegally covered. *Id.* The district court denied summary judgment on the disorderly conduct justification but granted summary judgment to the officer based on qualified immunity for the license plate violation. *Id.* The district court reasoned that even if the officer made a mistake as to whether the license plate was unlawfully covered, it was a reasonable mistake. *Id.*

On appeal, the Eighth Circuit limited its review to whether the officer was entitled to qualified immunity for stopping plaintiff based on the license plate violation. *Id.* at 663. The record before the Eighth Circuit included plaintiff's contention that his license plate was not covered, the officer's contention that the plate was covered, and a video of the stop that the court deemed inconclusive because it was too blurry to establish whether the license plate was covered. *Id.* at 664. The court concluded that, when viewing the facts in the light most favorable to plaintiff as the nonmovant, his license plate was not, in fact, unlawfully covered. *Id.* The court then considered whether the officer had an objectively reasonable basis for believing that the license plate was unlawfully covered. *Id.* at 664-65. The Eighth Circuit reversed the district court's granting of summary judgment based on qualified immunity because the fact of the visibility of the license plate was genuinely disputed by plaintiff's

and defendant's competing versions of events. *Id.* at 666. In essence, the court held that it was improper for the district court to resolve a factual dispute at the summary judgment stage. *Id.*

Similarly, here, the record contains two competing versions of events. Jansen contends that he relied on his radar gun to determine that Mulbah was speeding. Mulbah contends that he was not speeding based on a variety of factors. Viewing the facts and any inferences from the facts in the light most favorable to Mulbah, a jury could find that Mulbah was not in fact speeding, that Jansen did not utilize his radar gun on Mulbah's vehicle, that Jansen's radar gun reflected the speed of a vehicle other than Mulbah's, or that Jansen's radar gun indicated that Mulbah was not in fact speeding, but Jansen stopped Mulbah and lied to him about his speed. While Jansen contends that his use of the radar gun alone is enough to establish an objectively reasonable basis, he does not account for the fact that the only evidence the court has of his use of the radar gun is his word. There is no objective recording that Jansen actually used his radar gun on Mulbah's vehicle. Further, the cases cited by Jansen for the proposition that using a radar gun creates an objectively reasonable basis for stopping a vehicle are all criminal cases that did not require the court to view the facts and inferences in the light most favorable to the nonmoving party. Rather, the courts in those cases were free to give whatever weight they deemed appropriate to the government and the defendants, respectively. It is not the court's role at the summary judgment stage to determine whose "story is more plausible . . . because it is not [the court's] function to remove the

20

credibility assessment from the jury." *Id.* at 666 (quoting *Atkinson v. City of Mountain View*, 709 F.3d 1201, 1211 (8th Cir. 2013)). Thus, the court finds that a genuine dispute of material fact exists as to whether Jansen violated Mulbah's Fourth Amendment right to be free from an unreasonable seizure.

 Jansen does not dispute that Mulbah's Fourth Amendment right to be free from unreasonable seizure was clearly established at the time of the stop. At the time of Mulbah's stop, the law clearly established that a traffic stop must be supported by either reasonable suspicion or probable cause. *See De La Rosa*, 852 F.3d at 743; *Duffie*, 834 F.3d at 883. Because (1) there is a genuine dispute of material fact as to whether Jansen violated Mulbah's Fourth Amendment right to be free from an unreasonable seizure and (2) the right is clearly established, Jansen is not entitled to qualified immunity on Count I at this stage of the litigation. Thus, Jansen's motion for summary judgment on Count I is denied.

### III.    Count II: Duration of the Stop

Both Jansen and Mulbah filed competing motions for summary judgment on Count II. Dockets 13, 18. Jansen argues that he is entitled to summary judgment both on the merits and based on qualified immunity. Docket 13. Mulbah contends that he is entitled to summary judgment because Jansen unlawfully prolonged the traffic stop and because Jansen did not have arguable reasonable suspicion to extend the stop. *See* Docket 18; Docket 19 at 13-15, 28. Mulbah also filed an objection to the court's order granting Jansen leave to file a late statement of disputed material facts. Docket 33. The court

first addresses Mulbah's objection to the late filing of the statement of disputed material facts before turning to the competing summary judgment motions.

## A.   Jansen's Statement of Disputed Material Facts

Jansen filed a motion seeking the court's leave to file his statement of disputed material facts regarding Mulbah's motion for partial summary judgment. Docket 27. After finding good cause, the court granted Jansen leave to file his statement of disputed material facts 12 days after Jansen submitted his brief in opposition to Mulbah's motion for partial summary judgment.[2] *See* Dockets 25, 28. Mulbah objects to the court's order granting Jansen leave to file his belated statement of disputed material facts. Docket 33.

Under the District of South Dakota's local civil rules, "[a] party opposing a motion for summary judgment must respond to each numbered paragraph in the moving party's statement of material facts[.]" D.S.D. Civ. LR 56.1(B). "All material facts set forth in the movant's statement of material facts will be deemed to be admitted unless controverted by the opposing party's response to the moving party's statement of material facts." D.S.D. Civ. LR 56.1(D). Federal Rule of Civil Procedure 16(b)(4) provides that a schedule may be modified upon a showing of good cause and with the court's leave. For motions to extend the time to file a submission made after the time that the submission was due, the court may extend upon a showing of good cause and excusable neglect. Fed. R. Civ. P. 6(b)(1)(B). In determining excusable neglect, the court considers a

---

[2] The court granted Jansen's motion for leave to file his late statement of disputed material fact one day after Jansen filed the motion. *See* Dockets 27, 28.

variety of equitable factors including: the danger of prejudice to the opposing party, the length of the delay and the delay's impact on the proceedings, the reason for the delay, including whether the delay was within the reasonable control of the movant, and whether the movant acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

Here, the court found and continues to find good cause and excusable neglect. Mulbah is not prejudiced by allowing Jansen to file his statement of disputed material fact. As explained more fully below, the facts on which the court relies in its analysis of Count II are not in dispute between the parties. Deeming the facts admitted in favor of Mulbah would not change the result. The length of the delay was minimal because Jansen's statement of disputed material facts was filed 12 days after his response brief in opposition to Mulbah's motion for partial summary judgment. There was also no impact on the proceedings from the delay. Mulbah had yet to file his reply brief by the time Jansen filed his statement of disputed material facts, and Jansen noted in his motion seeking leave for the late filing that he would have no objection to Mulbah receiving an extension of time to file his reply brief if necessary. The only factor in Mulbah's favor is that the reason for the delay was Jansen's neglect. But there is no evidence that Jansen's neglect was in bad faith. On balance, the court finds both good cause and excusable neglect. Thus, Mulbah's objection is overruled. To the extent that Mulbah's objection is construed as a motion to reconsider, the court denies the motion.

**B.    Competing Motions for Summary Judgment**

As previously mentioned, the parties each filed competing motions for summary judgment on Count II. Docket 13, 18. In his motion, Jansen avers that he is entitled to summary judgment on the merits and because qualified immunity applies. Docket 13. For his part, Mulbah contends that he is entitled to summary judgment on Count II because Jansen violated his clearly established rights under the Fourth Amendment by prolonging the traffic stop, and his extension of the stop was done without arguable reasonable suspicion. *See generally* Docket 19 at 8-30. Because each motion was filed in the context of qualified immunity, the court first addresses whether Mulbah's alleged right to be free from an unlawfully prolonged traffic stop is clearly established.

**1.    Whether Mulbah's alleged right was clearly established.**

The Fourth Amendment protects against unreasonable searches and seizures by the government. U.S. Const. amend. IV. "A traffic stop constitutes a seizure under the Fourth Amendment." *Peralez*, 526 F.3d at 1119. "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). A routine traffic stop, then, is similar to a *Terry* stop, rather than a formal arrest. *Id.*

"Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop . . . and to attend to related safety concerns." *Id.* (citations omitted). An officer's mission during a traffic stop also includes "ordinary inquiries incident to [the traffic] stop." *Illinois v. Caballes*, 543 U.S.

24

405, 408 (2005). Generally, those inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355. Those ordinary inquiries, like enforcement of the traffic code, serve to ensure that vehicles on the road operate safely and responsibly. *Id.* Thus, a traffic stop may only last as long as necessary to achieve that mission. *Id.* "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*; *see also Caballes*, 543 U.S. at 407 ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

Absent at least reasonable suspicion, officers "may not conduct unrelated checks that extend the stop beyond the time reasonably required to complete its original mission." *United States v. Soderman*, 983 F.3d 369, 374 (8th Cir. 2020). Put another way, an officer may conduct certain inquiries unrelated to the original purpose of the stop so long as those inquiries do not prolong, or add time to, the stop; if the inquiries do add time to the stop, they must be supported by reasonable suspicion. *Rodriguez*, 575 U.S. at 355; *see also De La Rosa*, 852 F.3d at 743 ("[E]xtending the detention beyond the time needed to complete the traffic-ticketing process is unlawful unless additional investigation, such as a dog sniff of the vehicle's exterior, is warranted by the officer's reasonable suspicion that other criminal activity may be afoot.").

Here, the court concludes that Mulbah's Fourth Amendment right to be free from an unlawfully prolonged traffic stop was clearly established at the time that Jansen allegedly violated that right. *Rodriguez* had been the law of the land for over five years by the time Mulbah's rental vehicle was stopped. Further, Jansen does not genuinely challenge that Mulbah's right was not clearly established; instead, Jansen's arguments allege that he did not actually extend the stop, or, in the alternative, that he had arguable reasonable suspicion to extend the stop. *See* Docket 16 at 9-11; Docket 25 at 4-14; Docket 32 at 9-21. Thus, the court finds that Mulbah has met his burden on one prong of the qualified immunity analysis.

### 2. Whether Mulbah's clearly established right was violated.

The court next addresses the second prong of the qualified immunity analysis—whether Jansen violated Mulbah's Fourth Amendment right to be free from an unlawfully prolonged traffic stop. Like the qualified immunity analysis of the initial traffic stop, the court begins first with whether Jansen *actually* prolonged the traffic stop. If he did not actually prolong the traffic stop, then Jansen is entitled to summary judgment on Count II on the merits. If the court finds that Jansen did actually prolong the stop or that there is a genuine dispute of material fact that Jansen actually prolonged the stop, then the court continues its qualified immunity analysis.

### a. Prolongation in fact

In his complaint and motion for summary judgment, Mulbah contends that Jansen unlawfully prolonged the traffic stop. Docket 1 ¶¶ 71-79; Docket

19 at 13-15. Specifically, Mulbah argues that Jansen unlawfully prolonged the stop by approximately 35 seconds when he asked Mulbah questions related to the presence of guns and drugs in his rental vehicle. Docket 19 at 13. Mulbah also alleges that Jansen unlawfully prolonged the stop when he asked questions about: Mulbah's hometown, why Mulbah and his passengers drove instead of flew to their destination, and whether the passengers were involved in drug trafficking or criminal activity. *Id.* at 13 n.7. Mulbah additionally avers that Jansen unlawfully prolonged the traffic stop by requiring Mulbah "to situate himself in a passenger seat that was unmanageably small and by questioning [Mulbah] while a hostile canine barked and growled behind [Mulbah's] head." *Id.*

Conversely, Jansen argues that none of the questions or actions highlighted by Mulbah unlawfully extended the stop as a matter of law. Docket 16 at 10. Specifically, Jansen alleges that each of those actions, except for questioning Mulbah's passengers, occurred within the time reasonably required for Jansen to complete the tasks associated with the traffic stop. *Id.* at 9-11; Docket 25 at 5-7. Regarding Jansen's questions to Mulbah's passengers, he asserts that they occurred after Mulbah allegedly gave consent to search the rental vehicle, and thus, the traffic stop was necessarily extended by the time he questioned the passengers. Docket 16 at 10-11. Jansen's argument regarding the questions to Mulbah's passengers depends on the court's

disposition of Count III. The facts as they relate to whether Jansen actually unlawfully prolonged the traffic stop are not in dispute.[3]

Here, Jansen stopped Mulbah's rental vehicle for allegedly speeding. *See* Docket 20 ¶ 4; Docket 29 ¶ 4. Jansen told Mulbah that he would issue him a warning ticket for speeding. Docket 20 ¶ 4; Docket 29 ¶ 4. Thus, the critical question here is whether Jansen's highlighted interactions with Mulbah occurred before or after the time that the tasks tied to issuing the warning ticket were—or reasonably should have been—completed. *Rodriguez*, 575 U.S. at 355. The court has reviewed both the inside-facing video from Jansen's patrol vehicle and the outside-facing video from Jansen's patrol vehicle, both of which captured the interaction between Jansen and Mulbah. *See* Dockets 21-3, 21-4. The court recreates the relevant, approximate timeline of events from both videos:[4]

**03:35:** Jansen initiates the emergency lights on his patrol vehicle, signaling for Mulbah to pull his vehicle over to the side of the road.

**03:40-03:59:** Mulbah, travelling in the left lane, initially begins to pull over to the left shoulder of the roadway before correcting and pulling over to the right shoulder of the roadway.

---

[3] The factual disputes between the parties on Count II relate to whether Jansen had arguable reasonable suspicion to extend the stop or are legal conclusions that Jansen either did or did not unlawfully prolong the stop. *See generally* Dockets 23, 29.

[4] The videos from Jansen's patrol vehicle reflect the minute and second from when Jansen initiated the videos. They do not reflect the time of day. Thus, for example, 01:01 reflects one minute and one second into the stop rather than the time of day.

**04:00-04:15:** Jansen exits his patrol vehicle and approaches the passenger side of Mulbah's rental vehicle.

**04:16-04:35:** Jansen greets Mulbah and his passengers. Jansen indicates that he stopped Mulbah's vehicle for allegedly going 65 miles per hour in a 55 miles per hour zone.

**04:36-05:04:** Jansen tells Mulbah he is going to give him a warning for speeding. It appears on the outside-facing camera that Mulbah gives Jansen his driver's license and the rental agreement to the vehicle. Jansen asks who the renter of the vehicle is, and Mulbah responds that he is.

**05:05-05:31:** Jansen asks Mulbah to accompany him to Jansen's patrol vehicle. Jansen indicates he is just going to "warn" Mulbah. As Jansen and Mulbah walk toward the patrol vehicle, Jansen tells Mulbah that he has a police canine in the vehicle and that the canine will bark at Mulbah.

**05:32-05:40:** Jansen reenters his patrol vehicle and waits for Mulbah to enter.

**05:41-05:56:** Mulbah attempts to enter the front passenger seat of Jansen's patrol vehicle. He appears to have some difficulty entering the vehicle because Jansen's laptop encroaches on his space. Mulbah also appears to be hesitant because Jansen's canine barks at him. Jansen assures Mulbah that the canine is caged and cannot get to Mulbah. Mulbah struggles to close the door to Jansen's patrol vehicle on his first attempt but is able to close the door on his second attempt.

**05:57-06:37:** Jansen asks Mulbah where he and his passengers are coming from. Mulbah explains that he and his passengers are coming from Stanford and expands upon the trip's itinerary. Jansen asks if Mulbah is headed to New York, to which Mulbah responds affirmatively. Jansen opens his laptop at approximately the 06:16 mark and continues to ask Mulbah if he and his passengers go to school. Jansen also appears to be reviewing Mulbah's license while asking him this question. Mulbah explains that he and his passengers have just graduated from Stanford. While inputting Mulbah's information into his laptop, Jansen asks Mulbah what degree he has attained at Stanford. Mulbah responds that he is studying political science. Immediately after, Jansen attempts to quiet his canine because it was barking during this interaction.

**06:38-07:03:** While entering information into his laptop, Jansen asks Mulbah about where his passengers are from. Mulbah responds to Jansen's question. Jansen continues reviewing Mulbah's license and rental agreement and enters information into his laptop. At the 07:02 mark, Jansen's laptop audibly beeps. The parties agree that this signaled the results of the inquiry into Mulbah's vehicle registration, which "came back clear and showed no problems." Docket 20 ¶ 17; *see also* Docket 29 ¶ 17.

**07:04-07:13:** While reviewing the rental agreement, Jansen asks Mulbah if Mulbah obtained the rental vehicle in San Francisco. Mulbah responds affirmatively. Jansen continues reviewing the rental agreement.

**07:14-07:17:** While still reviewing the rental agreement, Jansen asks Mulbah if he is going to return the rental vehicle in Chicago. Mulbah responds affirmatively.

**07:18-07:26:** Jansen asks Mulbah how he plans to get to New York. Mulbah responds that he will fly there. Jansen then continues to review the rental agreement.

**07:27-07:58:** Jansen begins scrolling on his laptop. He asks Mulbah if he has a job lined up. While Mulbah begins answering, Jansen begins typing on his laptop.

**07:59:** Jansen's laptop audibly beeps again. The parties agree that this second beep signaled the results of Mulbah's driver's license inquiry, which showed that Mulbah's license was valid, and he had no warrants for his arrest. Docket 20 ¶ 20; Docket 29 ¶ 20.

**08:00-08:35:** Jansen continues scrolling on his laptop. He asks Mulbah about how many years of college he has completed. Mulbah responds. Jansen continues to scroll on his laptop.

**08:36-08:59:** Jansen asks Mulbah if he and his passengers have been making any stops on their trip. Mulbah responds that he and his passengers stopped at Mount Rushmore. Jansen continues to review and scroll on his laptop.

**09:00-09:22:** Jansen resumes typing on his laptop while he and Mulbah sit in silence.

**09:23-09:36:** Jansen asks Mulbah for his middle name. Mulbah responds and Jansen enters Mulbah's middle name into his laptop. Jansen then continues typing on his laptop.

**09:37-09:57:** Jansen asks Mulbah if the address that he has is "ok." Jansen then repeats the address, either from Mulbah's driver's license or from the rental agreement. Mulbah responds that the address listed is correct. Jansen enters that information into his laptop.

**09:58-10:28:** While still typing, Jansen makes small talk with Mulbah about New York City.

**10:29-11:17:** Jansen continues entering information on his laptop while he and Mulbah sit in silence.

**11:18-11:55:** While still typing, Jansen asks Mulbah why he and his passengers decided to drive from San Francisco to Chicago instead of flying. Mulbah responds. Jansen resumes typing and, while typing, asks Mulbah if he and his passengers are making a road trip out of their drive. Mulbah responds affirmatively.

**11:56-12:46:** Jansen and Mulbah sit in silence while Jansen continues entering information into his laptop. Jansen again reviews the rental agreement.

**12:47-13:25:** Jansen returns the rental agreement to Mulbah. Jansen then resumes reviewing the information on his laptop.

**13:26-13:38:** Jansen asks Mulbah for a phone number. Mulbah gives Jansen his phone number, which Jansen enters into his laptop.

**13:39-13:59:** Jansen continues to scroll and review information on his laptop. He and Mulbah sit in silence.

**14:00-14:05:** Jansen returns Mulbah's driver's license to Mulbah.

**14:06-14:12:** Jansen continues to scroll and review information on his laptop.

**14:13-14:37:** Jansen begins to print Mulbah's warning ticket. While the ticket is printing, Jansen asks Mulbah if he or his passengers have any weapons or drugs in the vehicle. Mulbah responds "no" to each of Jansen's questions.

**14:38-14:51:** The printer in Jansen's vehicle finishes printing Mulbah's warning ticket. Jansen folds the warning ticket. While folding the warning ticket, Jansen asks Mulbah for consent to search the vehicle. Mulbah consents to the search.

**14:52-15:10:** Jansen gives Mulbah the folded warning ticket. Jansen then tells Mulbah he is going to talk to Mulbah's passengers. Jansen tells Mulbah he can wait outside of Jansen's patrol vehicle so he does not have to listen to the canine bark.

**15:11-15:29:** Jansen and Mulbah exit Jansen's vehicle. Jansen approaches Mulbah's rental vehicle.

**15:30-15:52:** Jansen tells Mulbah's passengers that Mulbah gave him consent to search the vehicle. Jansen asks Mulbah's passengers if they have

any alcohol or marijuana in the vehicle. He then asks the passengers for consent to search their luggage. They evidently give Jansen consent.[5]

Mulbah contends that Jansen's authority for the seizure ended at the 07:59 mark in the stop because the tasks tied to the traffic infraction were—or reasonably should have been—completed by then. Docket 19 at 17; Docket 34 at 3. Mulbah's argument is grounded in the fact that, by the 07:59 mark, Jansen knew that Mulbah was the registered renter of the vehicle, knew that there were no issues with the registration, and knew that Mulbah was a valid driver with no warrants. Docket 19 at 17. Under Mulbah's logic, any inquiries after that point unlawfully extended the stop.

But Mulbah's argument ignores the requirement that Jansen enter in Mulbah's license, vehicle, and personal information into the system to produce a warning ticket, a fact that Mulbah does not dispute. Docket 23 ¶ 27. Thus, writing and printing a warning ticket is necessarily a task related to the original purpose for the stop. The conduct Mulbah complains of all occurred while Jansen either entered Mulbah's information into his laptop, reviewed that information, or printed the ticket.

First, Mulbah argues that Jansen's questions to Mulbah about New York City unlawfully prolonged the stop. Docket 19 at 13 n.7. The court's review of the inside-facing camera shows that, while Jansen and Mulbah talked about New York City, Jansen was entering information into his laptop. Second,

---

[5] The remainder of the outside-facing camera captures Jansen searching Mulbah's rental vehicle and the luggage inside of it.

Jansen continued to enter information into his computer while he asked Mulbah questions regarding flying versus driving from California to Illinois. Third, Jansen's questions to Mulbah about guns and drugs in his vehicle occurred while the warning ticket was printing. Sitting in silence would not have made the ticket print faster, and printing the warning ticket is a task related to the traffic stop's original mission—an alleged speeding violation. Fourth, while Jansen's questions to Mulbah's passengers occurred after Jansen had completed the warning ticket and given it to Mulbah, they also occurred after Mulbah consented to a search of his vehicle, which necessarily extended the scope of the stop.[6] Finally, Mulbah's contention that Jansen unlawfully prolonged the stop by requiring Mulbah to "situate himself in a passenger seat that was unmanageably small" is entirely without merit. Mulbah's situating himself into the front passenger seat was not an "unrelated check" or inquiry prohibited by *Rodriguez*. Further, the reason for the delay was primarily due to Mulbah's apparent reluctance to enter the patrol vehicle with Jansen's canine barking behind him.

The court finds that Jansen's conduct did not add time to the stop. Upon review of the video evidence, there is no evidence that Jansen did not act diligently. Jansen's inquiries occurred within the time reasonably required to complete the printing of the traffic ticket. Thus, the court concludes that the traffic stop was not unlawfully prolonged as a matter of law.

---

[6] The court expands upon this conclusion further in its discussion of Count III.

### b.      Arguable reasonable suspicion

Because the court concludes that Jansen did not unlawfully prolong the traffic stop as a matter of law, it does not reach the issue of whether Jansen had arguable reasonable suspicion to extend the scope of the traffic stop. Thus, the court concludes that Jansen is entitled to summary judgment on the merits on Count II. Mulbah's motion for partial summary judgment is denied. Jansen's motion for summary judgment on Count II is granted.

## IV.   Count III: Search of the Vehicle

Finally, Jansen argues that he is entitled to qualified immunity because the search of Mulbah's rental vehicle was lawful. Docket 16 at 11. Specifically, Jansen claims that he could have believed that Mulbah's consent was voluntary, and, alternatively, he had arguable reasonable suspicion to search the rental vehicle.[7] *Id.* Conversely, Mulbah contends that the search of the van was unconstitutional because he did not voluntarily consent to the search and Jansen lacked an objectively reasonable belief that Mulbah voluntarily consented. Docket 22 at 22-23. The court first addresses whether Mulbah's alleged right on Count III is clearly established.

In his complaint, Mulbah alleged that Jansen violated his rights under 42 U.S.C. § 1983, the Fourth Amendment, and the Fourteenth Amendment by

---

[7] The court notes that Jansen's search of the rental vehicle could not have been supported by arguable reasonable suspicion. In order to search a vehicle without a warrant, the law requires that, absent consent to search, an officer have probable cause to believe that the vehicle contains evidence of criminal activity. *See United States v. Claude X*, 648 F.3d 599, 602 (8th Cir. 2011). Probable cause to believe that the vehicle contained evidence of criminal activity has not been shown by these facts.

engaging in an unlawful search. Docket 1 at 10. Mulbah contends that the totality of the circumstances demonstrated that he did not voluntarily consent to the search of his rental vehicle, but that the consent was the product of duress and coercion. *Id.* ¶¶ 81-82. In the briefing on Count III, neither party genuinely addressed whether Mulbah's allegedly violated rights under the Fourth and Fourteenth Amendments were clearly established at the time of the search. *See* Docket 16 at 11-18; Docket 22 at 15-23; Docket 32 at 21-27.

It bears remembering that "[a]n individual defendant is entitled to qualified immunity if his conduct does not violate clearly established constitutional rights of which a reasonable person would have known." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018) (citing *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). For a right to be clearly established, "preexisting law must make the unlawfulness of the officials' conduct apparent so that they have 'fair and clear warning' they are violating the constitution[.]" *Id.* (citing *Pauly*, 137 S. Ct. at 551-52). The Supreme Court has repeatedly told courts "not to define clearly established law at a high level of generality." *Mullenix*, 577 U.S. at 12 (citation omitted). The burden is on the plaintiff to show that the right violated was clearly established. *Walker*, 881 F.3d at 1060 (citing *Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir. 2013).

Jansen and Mulbah focus on whether Mulbah voluntarily gave his consent for Jansen to search his rental vehicle. The inquiry under this prong of the qualified immunity analysis, then, is "whether, even if [the court] construe[s] the facts in a light most favorable to [Mulbah], a reasonable [officer]

37

in [Jansen's] position would have known that he was violating the constitution when he searched" Mulbah's rental vehicle after Mulbah gave his oral consent. *Id.*

"[D]etermining whether consent is voluntary requires a highly particular look at all the relevant circumstances." *Id.* (citing *United States v. Comstock*, 531 F.3d 667, 676 (8th Cir. 2008)). The Eighth Circuit employs a non-exclusive eleven factor test that acts as a guidepost to determine whether consent was voluntarily given. *See United States v. Magallon*, 984 F.3d 1263, 1281 (8th Cir. 2021). "Since questions of consent necessarily turn on the particular facts of a case, it may be hard to show that prior decisions should have put [Jansen] on notice that his search under the circumstances was unconstitutional or that every reasonable [officer] in his position would have understood that he was violating a constitutional right." *Walker*, 881 F.3d at 1060.

Here, while Mulbah is not required to provide a case directly on point to demonstrate that his right was clearly established, he must point to some existing precedent that places the question beyond debate or Jansen's conduct must be so egregious that there is no need to point to precedent. *Id.* at 1061. Mulbah fails to demonstrate that his allegedly violated right is a clearly established one. Instead of laying out how his allegedly violated right is clearly established, Mulbah argues only that his right was violated. Mulbah does not point to, and the court is unaware of, any case directly on point. Nor does Mulbah argue that existing precedent places the question beyond debate. Further, Jansen's conduct was not so egregious that it was obvious that his

actions were unlawful. The court cannot say that, under the circumstances, Jansen was on notice that his search of the rental vehicle was unconstitutional. Nor can the court say that every reasonable officer in Jansen's position would have understood that he was violating a constitutional right.

Like the Eighth Circuit in *Walker*, this court concludes that, at most, Jansen "made a bad guess in a gray area of the law—but the law gave him the breathing room to make such a guess." *Id.* at 1060. Thus, Mulbah has failed to carry his burden to demonstrate that Jansen violated a clearly established right, and Jansen is entitled to qualified immunity on Count III.

## CONCLUSION

Jansen is not entitled to qualified immunity on Count I because a genuine dispute of material fact exists as to whether he violated Mulbah's clearly established right to be free from an unreasonable seizure in the traffic stop context. Jansen is entitled to summary judgment on the merits on Count II because he did not prolong the traffic stop as a matter of law. Finally, Jansen is entitled to qualified immunity on Count III because Mulbah failed to demonstrate that his right that Jansen allegedly violated was clearly established. Thus it, is

ORDERED that Jansen's motion for summary judgment (Docket 13) is denied in part and granted in part, and Mulbah's motion for partial summary judgment (Docket 18) is denied.

It is FURTHER ORDERED that this matter will promptly be scheduled for trial on a date agreeable to the parties and the court.

Dated March 18, 2022.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE